FILED

April 19 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0429

DA 15-0429

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 91

EMPLOYERS MUTUAL CASUALTY COMPANY,

     Plaintiff and Appellee,

FISHER BUILDERS, INC.; JEFFREY S. FISHER;
ASHLI SLAWTER, d/b/a A. SLAWTER ARCHITECTURE;
and LAKE COUNTY, a political subdivision of the
State of Montana, and DOES 1-3,

     Defendants,

JERRY L. SLACK and KAREN SLACK,

     Defendants and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                 In and For the County of Flathead, Cause No. DV 11-1519(D)
                 Honorable David M. Ortley, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Bruce A. Fredrickson, Rocky Mountain Law Partners, PLLP;
                Kalispell, Montana

                J. Devlan Geddes, Paul S. Burdett, Goetz, Baldwin & Geddes, P.C.;
                Bozeman, Montana

        For Appellee:

                David C. Berkoff, Berkoff Law Firm, P.C.; Missoula, Montana

Submitted on Briefs:  March 2, 2016
Decided:  April 19, 2016

Filed:

                                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Jerry and Karen Slack (Slacks) appeal from an order entered in this declaratory action by the Eleventh Judicial District Court, Flathead County, granting summary judgment to Employers Mutual Casualty Company (EMC) and concluding that EMC had no duty to defend the insured because no coverage existed under the subject policy. We reverse and remand for further proceedings.

¶2    We address the following two restated issues:

*1. Did the District Court err by concluding that the alleged acts and subsequent consequences did not constitute an "occurrence" covered by the policy?*

*2. Did the District Court err by granting summary judgment in favor of EMC?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    The asserted facts in the underlying tort action that gave rise to the insurance coverage dispute herein are as follows: Since 1969, the Slacks have owned land on Flathead Lake, in Lake County, on which sat a vacation home of some age. In 2007, the Slacks hired contractor Jeffrey Fisher and his company, Fisher Builders, (Fisher) to build "a remodeled home located on the site of the small home" to serve as a year-round residence. Because the Slacks' vacation home predated the adoption of Lake County's zoning regulations, the proposed construction modifications were deemed by the County to be "grandfathered" in as a pre-regulation structure and, thus, an acceptable non-conforming property use. However, in order to maintain that status, the remodeled

home had to incorporate the existing structure.[1] Approval of the Slacks' permit was also conditioned on the requirement that "[t]he existing deck shall remain unchanged as a result of the proposed project."

¶4 Fisher elevated the existing home structure on steel I-beams to pour a new foundation. With the existing structure resting on the beams, Fisher began to dismantle the walls of the vacation home and, in so doing, discovered an infestation of carpenter ants. He cut out the ant-infested planks, apparently intending to salvage what usable materials he could from the remaining structure. He subsequently burned the ant-infested boards.[2] At some point during this work, the deck collapsed.

¶5 A member of the Lake County Planning Department conducted a site visit and issued a cease and desist order, halting all work on the project. The Planning Department revoked the Slacks' construction permit, citing multiple violations of the Lakeshore Protection Regulations and noting that the "existing structure on the site had been destroyed." The Slacks appealed the revocation of their construction permit to the District Court, eventually reaching a settlement with Lake County that allowed them to construct a home, albeit a smaller one than had previously been approved.

---

[1] The record before us is unclear about what exactly this requirement entailed. We address this matter more specifically in the below discussion of the District Court's granting of EMC's motion for summary judgment.

[2] To underscore its position that Fisher's acts were intentional, EMC stresses the misdemeanor criminal charges brought against Fisher and his guilty plea to violations of the Lake County zoning regulations and Lakeshore Protection laws. However, we do not consider these subsequent proceedings to be dispositive under the proper inquiry, as set forth herein.

3

¶6 The Slacks then initiated a negligence action against Fisher and his construction company, Fisher Builders (the underlying action). EMC had issued a commercial general liability insurance policy to Fisher. The policy provided:

> 1. Insuring Agreement
>    a. We [EMC] will pay those sums that the insured [Fisher] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>    b. This insurance applies to "bodily injury" and "property damage" only if:
>       (1) The "bodily injury" or "property damage" is caused by an "occurrence" . . . .
>
> .  .  .
>
> 2. Exclusions
> This insurance does not apply to:
> a. Expected or Intended Injury
> "Bodily injury" or "property damage" expected or intended from the standpoint of the Insured.
>
> .  .  .
>
> SECTION V – DEFINITIONS
>
> .  .  .
>
> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

¶7 Fisher gave notice of the lawsuit to EMC, who provided a defense in the underlying action under a reservation of rights while filing a declaratory action (the present case), alleging there was no coverage and it had no duty to defend or indemnify

any party in the underlying action. EMC and the Slacks both moved for summary judgment, with Fisher joining the Slacks' motion. Fisher and Fisher Builders ultimately settled with the Slacks, consenting to entry of judgment in favor of the Slacks and assigning their rights under the EMC insurance policy to the Slacks. The District Court granted EMC's motion for summary judgment, concluding that Fisher's conduct was clearly intentional and did not fit within the meaning of "occurrence" under the policy, "regardless of whether Fisher intended the consequences or not."

¶8      Slacks appeal.

## STANDARD OF REVIEW

¶9      "The interpretation of an insurance policy presents a question of law, and we will review the District Court's legal conclusion for correctness." *Landa v. Assurance Co.*, 2013 MT 217, ¶ 13, 371 Mont. 202, 307 P.3d 284 (citation omitted).

¶10     "The standard of review in appeals from summary judgment rulings is *de novo*." *Blair v. Mid-Continent Cas. Co.*, 2007 MT 208, ¶ 14, 339 Mont. 8, 167 P.3d 888 (citing *Williams v. Union Fid. Life Ins. Co.*, 2005 MT 273, ¶ 18, 329 Mont. 158, 123 P.3d 213). "We apply the same M. R. Civ. P. 56 criteria as the district court, and summary judgment may be granted only 'when the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law.'" *Landa*, ¶ 13 (quoting *Fasch v. M.K. Weeden Constr., Inc.*, 2011 MT 258, ¶ 14, 362 Mont. 256, 262 P.3d 1117).

**DISCUSSION**

¶11  *1. Did the District Court err by concluding that the alleged acts and subsequent consequences did not constitute an "occurrence" covered by the policy?*

¶12  The Slacks contend that the District Court erred by holding that, in the context of general liability insurance, the term "occurrence," defined by the policy as "an accident," categorically precludes coverage for any intentional conduct on the part of the insured. They argue the District Court erred by concluding that unintended consequences resulting from Fisher's acts did not satisfy the definition of "occurrence." EMC responds that this Court "has clearly, unambiguously, and consistently stated that in the context of [commercial general liability] insurance coverage where an insurer's policy defines 'occurrence' as an accident, damages stemming from the insured's intentional acts do not constitute accidental 'occurrences' – even if the resulting consequences and related damages are unintended."

¶13  Slacks cite extensively to *Northwestern Nat'l Cas. Co. v. Phalen*, 182 Mont. 448, 597 P.2d 720 (1979). There, Phalen, the insured, punched another man outside of a bar. Phalen's victim ran away after Phalen's punch, and Phalen gave chase. Before Phalen caught him, a third party tripped the victim. *Phalen*, 182 Mont. at 451, 597 P.2d at 722. The victim fell off the curb and hit the pavement, sustaining serious injuries. *Phalen*, 182 Mont. at 452, 597 P.2d at 722. After the victim brought suit against Phalen and the intervening third party who tripped him, Phalen's insurer claimed the incident did not constitute an "occurrence" under the policy and was not covered. *Phalen*, 182 Mont. at 454, 597 P.2d at 723. The policy excluded from coverage "bodily injury or property

6

damage, which is either *expected or intended from the standpoint of the insured*," as does the policy here. *Phalen*, 182 Mont. at 455, 597 P.2d at 724 (emphasis in original). The district court entered summary judgment in favor of the insurer, concluding there was no coverage. *Phalen*, 182 Mont. at 454, 597 P.2d at 724. This Court reversed, stating, "[W]e would interpret the clause to mean that it precludes coverage for bodily injuries or damages, though not specifically intended by the insured, *if the resulting harm was within the expectation or intention of the insured* from his standpoint." *Phalen*, 182 Mont. at 459, 597 P.2d at 726 (emphasis added). We also determined that summary judgment was improper because a question of material fact remained regarding Phalen's intention and expectation as to his victim's injuries. *Phalen*, 182 Mont. at 460, 597 P.2d at 727.

¶14    We considered a similar coverage question in *Miller Mut. Ins. Co. v. Strainer*, 204 Mont. 162, 663 P.2d 338 (1983). Strainer worked at the ASARCO smelter in East Helena, and played a practical joke on a coworker by removing a filter from the coworker's respirator and "squirt[ing] a puff of smoke into the respirator's air chamber." *Strainer*, 204 Mont. at 164, 663 P.2d at 339. While Strainer claimed he "did not know the smoke would cause any injury other than momentary discomfort[,]" the coworker "inhaled the smoke and allegedly was seriously injured." *Strainer*, 204 Mont. at 164, 663 P.2d at 339. The coworker brought suit against Strainer, whose insurer brought an action to declare there was no coverage under the policy, which excluded coverage for "bodily injury or property damage which is either expected or intended from the standpoint of the insured," because Strainer had acted intentionally. *Strainer*, 204 Mont. at 166, 663 P.2d

7

at 340. We disagreed with the insurer, citing to *Phalen* for the principle that "intentional acts are *not* excluded under an insurance policy *unless the intentional act results in injuries which would be expected or intended*. A person may act intentionally without intending or expecting the consequences of that act." *Strainer*, 204 Mont. at 167, 663 P.2d at 341 (emphasis added).

¶15 *Phalen* and *Strainer* both involved clearly intentional acts, yet in both cases we determined that the acts may nonetheless have constituted an "occurrence"[3] under the policies at issue because the subsequent consequences may not have been intended or expected by the actor. Our analysis, simply framed, was to consider 1) whether the act itself was intentional, and 2) if so, whether the consequence or resulting harm stemming from the act was intended or expected from the actor's standpoint. *See Phalen*, 182 Mont. at 457, 597 P.2d at 725.

¶16 EMC relies heavily on *Blair*, calling it "the seminal case on this very issue." Blair owned eight acres of land in a residential subdivision. He excavated a gravel pit on his property and the subdivision's landowners association brought suit against him, seeking an injunction and restoration of the property. *Blair*, ¶¶ 4-5. Blair tendered defense of the action to his insurance company, asserting that, despite his intentional act to excavate gravel, "he did not intend to cause harm to neighboring property owners," and thus his actions qualified as an "occurrence" under the policy. *Blair*, ¶ 17. In the declaratory judgment action, the district court granted summary judgment to Blair's insurer,

---

[3] In the policy at issue in *Phalen*, "occurrence" was further defined as an "accident." *Phalen*, 182 Mont. at 455, 597 P.2d at 724. The *Strainer* policy's definition of "occurrence" was not provided by the opinion.

concluding that "Blair's admitted intentional gravel operation did not constitute an occurrence . . . ." *Blair*, ¶ 12. This Court affirmed, reasoning that because "Blair deliberately moved gravel on his property, which caused the alleged damages[,]" his actions were "no accident." *Blair*, ¶ 19. In retrospect, while we reached the correct result in *Blair*, the analysis we employed in that case was incomplete.

¶17 In *Blair*, we distinguished the *Phalen* line of authority on the ground that the policy at issue did not contain language requiring consideration of whether the damage was "expected or intended from the standpoint of the insured." *Blair*, ¶ 20.[4] Therefore, we cited a similar definition of "accident" as a happening "that occurs without intention or design on the part of the insured." *Blair*, ¶ 19 (citing *Safeco Ins. Co. of Am. v. Liss*, 2000 MT 380, ¶ 36, 303 Mont. 519, 16 P.3d 399). Yet, we failed to fully analyze under this definition whether the damages allegedly caused by Blair were intended or designed, and simply acceded to Blair's subjective assertion that "he did not intend to cause harm" to his neighbors by locating a gravel pit next to them. *Blair*, ¶ 17. We thus decided the case on the sheer force of a declaration that "[u]nequivocally, this was no accident." *Blair*, ¶ 19.

¶18 Instead of distinguishing the *Phalen* line of authority, we should have applied it by holding that Blair's subjective assertion that "he did not intend" to cause the resulting

---

[4] EMC offers material outside of that portion of the record that was before us in *Blair* to demonstrate that the policy in *Blair* indeed contained the same "expected or intended" exclusion that we stated did not exist, and upon which we distinguished the *Phalen* line of authority. Of course, we cannot consider that material now, but even if that assertion were true, such exclusion would have likewise provided the proper basis for determining that no coverage existed in *Blair*, based on the reasoning set forth herein.

9

harm to his neighbors was not dispositive, and that, pursuant to the second prong of our construct, Blair's act of siting a gravel pit in a residential neighborhood had the objective intention or design of impacting the adjacent residential properties. *Blair*, ¶ 17. By so doing, we would have reached the same denial of coverage but decided the case consistently with the principles of our previous cases: an "accident" may include intentional acts, but coverage is excluded when the consequences of those acts are objectively intended or expected from the standpoint of the insured, as the consequences in *Blair* surely were. *Phalen*, 182 Mont. at 459, 597 P.2d at 726; *Strainer*, 204 Mont. at 167, 663 P.2d at 341. Likewise, we could have employed this analysis in *Landa*, where we held there was no coverage under the same policy definition of "occurrence" for tort claims that were "wholly comprised of [the insured's] intentional acts" of deceptive statements and misrepresentation. *Landa*, ¶ 24. Instead of relying on *Blair's* focus on whether the act was truly intentional, we would have reached the same denial of coverage under the second prong of our construct by holding that the insured's deceitful statements about his business had the objective intention or design of misleading or defrauding the prospective buyer of the business.

¶19    As noted above, the second prong of the analysis (whether the insured intended or expected the injury stemming from an intentional act) is an objective inquiry. In *Blair*, *Strainer*, and many other cases, the insured made the subjective claim that he did not intend the harm that ensued from his intentional act. It would be a rare case indeed, as reflected in the absence of such cases in our precedent, where an insured would acknowledge that he intended to injure or cause harm to others. However, courts are well

10

equipped to determine objectively what injuries could reasonably be expected to result from an intentional act. *See N. H. Ins. Group v. Strecker*, 244 Mont. 478, 798 P.2d 130 (1990) (father who molested his minor daughter for over 10 years could expect the personal injuries that followed, including medical treatment and emotional distress, regardless of his protestations to the contrary); *Am. States Ins. Co. v. Willoughby*, 254 Mont. 218, 836 P.2d 37 (1992) (spectator who punched, kicked, and bit security guards could expect physical injuries that resulted from assault; "[t]hese types of action are per se intentional and the intent to seriously injure is evident from the commission and type or nature of the act itself."); *Smith v. State Farm Ins. Cos.*, 264 Mont. 129, 870 P.2d 74 (1992) (homeowner who punched teenager in the face could expect physical injuries that followed, including knocking out a tooth); *Landa* (business owner who made intentional misrepresentations to a prospective buyer could expect injuries from reliance on those misrepresentations).

¶20 The District Court erred by reasoning that "the Montana Supreme Court has rejected" the Slacks' argument that the term accident may "include intentional conduct with unintended results." In fairness to the District Court, this Court has not been consistent in the analysis to be applied when considering this coverage issue. Nonetheless, holding otherwise could broadly eliminate coverage for many damage events that began with an initial act of intention but led to unexpected results. As we said many years ago, pointed out by the Slacks: "Strange and wonderful indeed are the circumstances in which persons are killed or injured by the intentional pulling of the trigger of an 'unloaded' gun, and it is clear that in such situations the discharge itself and

11

the resulting injuries are accidental." *Terry v. Nat'l Farmers Union Life Ins. Co.*, 138 Mont. 333, 339, 356 P.2d 975, 978 (1960) (citation omitted). With the clarification provided herein that the policy language defining "accidents" may include intentional acts if the damages were not objectively intended or expected by the insured, our inconsistent statements have been harmonized and the proper standard can be applied on remand.

¶21    2. *Did the District Court err when it granted summary judgment in favor of EMC?*

¶22    Slacks argue that the District Court erred by resolving issues of material fact when granting EMC's motion for summary judgment, and by resolving disputed facts in favor of EMC. Specifically, the Slacks claim that the District Court determined that Fisher left parts of the home and/or deck unsupported, causing the deck to collapse, that Fisher "destroyed" the original structure by dismantling the walls, and that Fisher failed to retain a sufficient portion of the original structure in order to maintain the non-conforming use status.

¶23    EMC argues that the Slacks' claim of error is without merit because "[t]he district court's findings are based upon the substantial evidence and are not clearly erroneous." However, we review a trial court's grant of summary judgment de novo, applying the exact same standards that the district court applied. *Landa*, ¶ 13. At the summary judgment stage, "'the court *does not make findings of fact*, weigh the evidence, choose one disputed fact over another, or assess the credibility of the witnesses.'" *Johnston v.*

*Centennial Log Homes & Furnishings, Inc.*, 2013 MT 179, ¶ 24, 370 Mont. 529, 305 P.3d 781 (emphasis added) (citation omitted).

¶24 The Slacks offer that "[t]he record establishes that Fisher did not intentionally tear down the entire home. He took apart some of the walls . . . ." Fisher testified that he and his crew "pulled the tarpaper loose from the house," and "started taking those boards loose" in order to move a wall "a foot closer to the lake than the original house," as contemplated by the building plan. Fisher testified that, after removing the boards, he and his crew discovered an infestation of carpenter ants and they sawed away the ant-infested boards. "So we cut all the ones that were heavily laden[] with carpenter ants into two-foot sections." Fisher further testified that "the deck fell down because it wouldn't support itself." EMC asserts that "Fisher unilaterally and purposely tore down the Slacks' entire home . . . ," and that he admitted as much. However, in support of this statement, EMC cites to pages of Fisher's deposition that are not included with the record before this Court (only excerpts were provided). We cannot determine with certainty from the record provided whether the District Court's statement that Fisher "destroy[ed] the original structure . . . " is supported by uncontested facts, but it appears doubtful.

¶25 The Slacks also contend the District Court erred by determining that Fisher's actions violated the construction permit. They point to Fisher's testimony about his meeting with the Lake County Planning Department Planner, where Fisher stated: "We had the meeting with Sue Shannon when she gave us the permit. After the meeting I said . . . 'How much of this old house would you like me to use in here' . . . . She said, 'I would like you to use 50 percent.'" They cite Fisher's testimony expressing his

understanding that the non-conforming use permit allowed him to dismantle the original structure and then reuse/reassemble the materials in the remodeled home. "And did we have a non-conforming structure? [The Lake County Planner] always said we needed to have a non-conforming structure in place. He didn't say it had to be the old non-conforming structure, he said we had to have a non-conforming structure." "[T]here is no possible way you can move a wall in two feet without taking it apart and reassembling it." In response, EMC again cites to portions of Fisher's testimony not provided to the Court by stating that "[Fisher] admitted at his deposition purposely tearing down the entire house even after being informed by Lake County that the original structure was required to be in place at all times."

¶26 Given this testimony from the record as provided, we conclude that issues of material fact precluded summary judgment, and that further proceedings will be necessary to resolve factual issues related to application of the coverage provisions of the policy.

¶27 Reversed and remanded for further proceedings consistent herewith.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER

14